IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

YOLANDA F. TURNER,                     §
                                       §
            Plaintiff,                 §
                                       §
v.                                     §        CIVIL ACTION NO. H-12-3365
                                       §
THE HERSHEY COMPANY d/b/a              §
HERSHEY FOODS CORPORATION,             §
                                       §
            Defendant.                 §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Yolanda Turner, brings this action against defendant, The Hershey Company d/b/a Hershey Foods Corporation, for race and color discrimination in employment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and 42 U.S.C. § 1981.[1]  Pending before the court is Defendant's Motion for Summary Judgment ("Defendant's MSJ") (Docket Entry No. 33).  For the reasons stated below, defendant's motion for summary judgment will be denied.

---

[1]Plaintiff originally alleged additional claims for retaliation and harassment and for violation of § 21 of the Texas Labor Code, but in response to defendant's motion for summary judgment, plaintiff abandons all claims for retaliation and harassment in violation of Title VII and § 1981, and also abandons all claims asserted under the Texas Labor Code. See Plaintiff's Response to Defendant's Motion for Summary Judgment ("Response to MSJ"), Docket Entry No. 36, p. 1 ¶ 1.02.

## I.  <u>Undisputed Facts</u>

Plaintiff is a black, African-American female who was hired by defendant in or around April of 1998.[2]  From about July of 2003 until she was discharged in December of 2011, plaintiff served as a Retail Sales Representative ("RSR") in the Houston market.[3] During the events at issue in this action, plaintiff's immediate supervisor was Russell Williams, an African-American male.[4]

RSRs are each assigned to a particular territory within a larger, overall market.  Plaintiff's territory consisted of "high volume chain grocers and mass merchandiser customers,"[5] to whom she was required to sell Hershey products, and for whom she was required to "insure best in class merchandising to include building displays, packing out product, and replenishing permanent secondary displays and maintain salability of all authorized Hershey Items."[6] As an RSR plaintiff was required to use a handheld device to enter data into Hershey's Retail Execution ("REX") System for purposes of tracking and reporting the time she spent in stores.[7]

---

[2]Oral Deposition of Yolanda F. Turner ("Turner's Deposition"), Exhibit A to Defendant's MSJ, Docket Entry No. 33-1, p. 22.

[3]<u>Id.</u> at 51.

[4]<u>Id.</u> at 82.

[5]Job Description: Retail Sales Representative, Exhibit G to Defendant's MSJ, Docket Entry No. 33-7.

[6]<u>Id.</u>

[7]Turner's Deposition, Exhibit A to Defendant's MSJ, Docket Entry No. 33-1, pp. 97-99; Oral Deposition of Russell Williams
(continued...)

On November 9, 2011, plaintiff's supervisor, Williams, monitored plaintiff's performance throughout the day and documented on a performance record the times that he observed her entering and leaving stores.[8]  Because the start and end times that plaintiff entered into the REX System for November 9, 2011, did not correspond with the times that Williams entered on the performance record he prepared, Williams suspended plaintiff with pay pending an investigation into her alleged falsification of REX data.[9]  On or about December 14, 2011, plaintiff received a Notice of Termination stating: "Your employment with The Hershey Company is terminated effective December 14, 2011[,] due to falsification of information in your REX handheld device."[10]   Williams takes responsibility for having made both the request and the ultimate

---

[7](...continued)
("Williams' Deposition"), Exhibit C to Defendant's MSJ, Docket Entry No. 33-3, p. 58.

[8]Williams' Deposition, Exhibit C to Defendant's MSJ, Docket Entry No. 33-3, pp. 104-06.  See also Performance Record dated November 9, 2011 ("Performance Record"), Exhibit K to Defendant's MSJ, Docket Entry No. 33-11.

[9]Turner's Deposition, Exhibit A to Defendant's MSJ, Docket Entry No. 33-1, pp. 164-66, 173; Williams' Deposition, Exhibit C to Defendant's MSJ, Docket Entry No. 33-3, pp. 110-11, 116.

[10]Notice of Termination, Exhibit N to Defendant's MSJ, Docket Entry No. 33-14; Turner's Deposition, Exhibit A to Defendant's MSJ, Docket Entry No. 33-1, pp. 179-80; Williams' Deposition, Exhibit C to Defendant's MSJ, Docket Entry No. 33-3, pp. 101-02.

decision to discharge the plaintiff.[11]   Plaintiff was replaced by Suzanne Rowe, a white woman.[12]

## II.   **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex, 106 S. Ct. at 2553-2554).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits,

---

[11]Williams' Deposition, Exhibit C to Defendant's MSJ, Docket Entry No. 33-3, pp. 189-90.

[12]Id. at 33-34.

depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S. Ct. at 2553-2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000). The nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. Id. at 1537. Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

### III.  **Analysis**

Plaintiff alleges that defendant discriminated against her on the basis of race and color by terminating her employment in December of 2011. Defendant argues that it is entitled to summary judgment on plaintiff's claims because plaintiff is unable to cite evidence capable of raising a genuine issue of material fact that the legitimate, non-discriminatory reason stated for her discharge was not true but, instead, a pretext for discrimination.

### A.  **Applicable Law**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment because of such individual's race, color . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 of Title 42 similarly prohibits employers from discriminating against an employee on the basis of race or color. 42 U.S.C. § 1981. Claims brought pursuant to Title VII and § 1981 are governed by the same legal and evidentiary standards. See Lawrence v. University of Texas Medical Branch at Galveston, 163 F.3d 309, 311 (5th Cir. 1999) ("Employment discrimination claims brought under 42 U.S.C. [§] 1981 . . . are analyzed under the evidentiary framework applicable to claims arising under Title VII."). A claim of employment discrimination can be proven through direct or circumstantial evidence. Russell v. McKinney Hospital Venture, 235 F.3d 219, 222 (5th Cir. 2000). Plaintiff does not argue that this is a direct evidence case. Instead, citing McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973), plaintiff states that "[a]n intentional discrimination claim like this one is normally analyzed using the three-step burden-shifting proof framework."[13] The McDonnell Douglas framework is used to analyze circumstantial evidence. This framework requires the plaintiff to demonstrate a prima facie case of discrimination. The framework then shifts the burden to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action at issue. If the defendant meets its burden of production, the burden

---

[13]Response to MSJ, Docket Entry No. 36, p. 18 ¶ 4.12.

shifts back to the plaintiff to cite evidence capable of creating a genuine issue of material fact for trial that the employer's stated reason is not the true reason but, instead, a pretext for discrimination. Id. See also Reeves, 120 S. Ct. at 2106.

**B.   Application of the Law to the Facts**

   1.   Prima Facie Case

To establish a prima facie case of discriminatory discharge plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the job she held, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside of her protected class, other similarly-situated employees were treated more favorably, or she was otherwise discharged because of her race. See Vaughn v. Woodforest Bank, 665 F.3d 632, 636 (5th Cir. 2011). Defendant does not dispute that plaintiff belongs to a protected class, i.e., she is African-American; she was qualified for her position as RSR; she suffered an adverse employment action in the form of discharge; and was replaced by someone outside of her protected class, i.e., Suzanne Rowe, a white woman. Plaintiff has therefore established a prima facie case.

   2.   Non-Discriminatory Reason for Discharge

Because plaintiff has established a prima facie case, defendant must proffer evidence of a legitimate, non-discriminatory reason for discharging her. Vaughn, 665 F.3d at 636 (citing Texas Department of Community Affairs v. Burdine, 101 S. Ct. 1089,

1094-95 (1981)).  Defendant argues that it is entitled to summary judgment because plaintiff was discharged for a legitimate, non-discriminatory reason, i.e., for falsifying REX data for November 9, 2011.[14]  As evidence that plaintiff falsified REX data for November 9, 2011, defendant cites the deposition of plaintiff's immediate supervisor, Williams.  Williams testified that he observed plaintiff's work and prepared a performance report for that date, but that his observations of the times that plaintiff entered and exited her stores conflicted with plaintiff's REX entries for that day.[15]  Defendant argues that "[t]here is simply no evidence — beyond Plaintiff's self-serving speculation — from which a reasonable factfinder could conclude that the stated reason for her termination was pretextual or the product of impermissible discriminatory animus."[16]

Since defendant has met its burden of producing evidence of a legitimate, nondiscriminatory reason for discharging plaintiff, the presumption of discrimination created by plaintiff's prima facie case disappears and plaintiff "bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that [defendant] intentionally discriminated against her because of

---

[14]Defendants' MSJ, Docket Entry No. 33, p. 14 ¶ 33.

[15]Id. (citing Williams' Deposition, Exhibit C thereto, Docket Entry No. 33-3, pp. 101-02, 104-06, 110-11, 116, 189-90).  See also Performance Record and Notice of Termination, Exhibits K and N to Defendant's MSJ, Docket Entry Nos. 33-11 and 33-14, respectively.

[16]Defendant's MSJ, Docket Entry No. 33, p. 14 ¶ 32.

her protected status." Vaughan, 665 F.3d at 637 (quoting Wallace
v. Methodist Hospital System, 271 F.3d 212, 219 (5th Cir. 2001)).

### 3.   Evidence of Discriminatory Intent

Plaintiff may raise a genuine issue of discriminatory intent
using one of two alternative methods:  pretext or mixed-motive.
Vaughn, 665 F.3d at 637.  To establish pretext plaintiff must show
that defendant's proffered reason for her discharge is false or
unworthy of credence.  Id. (citing Laxton v. Gap, Inc., 333 F.3d
572, 578 (5th Cir. 2003)) .  Plaintiff may establish pretext by
presenting evidence of disparate treatment, i.e., evidence that she
was treated more harshly than other similarly situated employees
for nearly identical conduct.  Under the mixed-motive alternative,
plaintiff must present evidence capable of establishing that
defendant's stated reason for her discharge "while true, is only
one of the reasons for [her employer's] conduct, and another
'motivating factor' is [plaintiff's] protected characteristic[s]."
Vaughn, 665 F.3d at 636.  See also Desert Palace, Inc. v. Costa,
123 S. Ct. 2148 (2003) (holding that direct evidence of
discrimination is not required in order to prove discrimination in
mixed-motive cases).

Asserting that plaintiff was discharged for falsifying REX
data for November 9, 2011, defendant argues that plaintiff is
unable to present evidence capable of establishing that its
legitimate, non-discriminatory reason for her discharge is false or
a pretext for race or color discrimination.  Defendant argues that

it is important to note that Plaintiff does not even
attempt to deny her REX falsification. . . Rather, she
claims that falsification was the norm, and she
identifies three specific examples to help prove her
point. Even assuming the truth of these examples,
however, none of them creates an issue of fact as it
relates to Plaintiff's termination.[17]

Defendant argues that

[o]utside of these three examples, none of which have
anything to do with the stated basis for Plaintiff's
termination, Plaintiff cannot point to any evidence to
prove that REX falsification was the standard "practice"
at Hershey.  To the contrary, two different witnesses
(Plaintiff's own witnesses, no less, one of whom was
actually terminated for her own admitted REX
falsification) testified that RSRs were advised, in no
uncertain terms, that "you can't clock in your stores
when you're not there," and "[y]ou should never clock in
to a store when you're not in a store."[18]

In addition defendant argues:

To establish pretext . . . Plaintiff must show that a
similarly-situated RSR *outside* of her protected class
(i.e., non-African-American) had falsified REX data, but
was *not* terminated as a result. . . . This, she does not
(because she cannot) do.  Hershey, meanwhile, has
identified at least one Caucasian RSR — Ryan Parsons —
who was terminated by Williams for REX falsification. . .
Thus, the evidence of record reveals three RSRs reporting
to Williams who were terminated for REX falsification:
Plaintiff (African-American); Tyson (African-American),
and Parsons (Caucasian).  There is  no inference of
discrimination to draw from this evidence — particularly
where Plaintiff has failed to show that a similarly-
situated, non-African-American RSR was caught falsifying

---

[17]Id. at 14 ¶ 33 (citing Turner's Deposition, Exhibit A to
Defendant's MSJ, Docket Entry No. 33-1, pp. 160 and 184).

[18]Id. at 15-16 ¶ 35 (citing Examination Under Oath of Markessa
Carter ("Carter's Deposition"), Exhibit E, Docket Entry No. 33-5,
p. 11; and Examination Under Oath of Christina Tyson ("Tyson's
Deposition"), Exhibit F, Docket Entry No. 33-6, p. 16).

his or her REX data, but was afforded more favorable
treatment.[19]

Plaintiff responds that defendant's argument that plaintiff
was discharged for having falsified REX data for November 9, 2011,
is untrue.  Plaintiff "vehemently denies having falsified time in
the REX."[20]  Plaintiff also argues that the stated reason for her
discharge is pretextual because her supervisor, Williams,
"specifically directed his Black African-American sales staff to do
exactly what he calls falsifying time in the REX,"[21] and "was not
shy about telling and warning Black workers that they were being
targeted for termination *because they are Black*."[22]  Plaintiff also
argues that she has cited evidence capable of establishing pretext
because she was treated less favorably than Parsons, the Caucasian,
white employee who defendant contends was discharged for similar
reasons.[23]

As evidence that defendant's stated reason for her discharge
is untrue, plaintiff cites her own deposition testimony:

---

[19]Id. at 16-17 ¶ 37 (citing id. at 10 ¶ 24 and Williams'
Deposition, Exhibit C thereto, p. 162).

[20]Response to MSJ, Docket Entry No. 36, pp. 12-13 ¶ 3.21
(citing Turner's Deposition, Exhibit 2, Docket Entry No. 36-2,
pp. 181:24-182:9).

[21]Id. at 11 ¶ 3.20.

[22]Id. at 6 ¶ 3.13.

[23]Id. at 20 ¶ 4.17.

Q.   Okay.   And, again, the stated basis here in the
     letter:   Due to falsification of information in
     your REX handheld device.   We've talked about the
     reasons   why   you   say   that   there   was   no
     falsification.   You checked in; you checked out.
     Those were the times that you were in the store,
     correct?

A.   To the best of my knowledge, yes.

Q.   And if Russ Williams says otherwise and he says
     that I have personal observation of her coming and
     going from stores at different times, he's not
     correct?

A.   I would say that he's not correct.

                         .  .  .

Q.   When you say: However, I was merely performing work
     duties in a manner managers had instructed me to,
     do I take that to mean -- or do you intend to mean
     that there were falsifications that day and your
     managers had instructed you to do that?

A.   No.   What I'm saying was I don't know if there were
     falsifications that day.   [But that's -- this is
     how we always worked REX.   I mean, if you have to
     leave a store -- I don't recall.   But if you have
     to leave the store and if you know you haven't
     spent the amount of time at Hershey, once you spend
     that time, go ahead and stay clocked into that
     store.   So this was a practice.   I can't say for
     sure or not if it happened on that day.][24]

As evidence that Williams directed his sales staff to falsify

time in the REX, plaintiff cites not only her own deposition

testimony, but also the deposition testimony of Christina Tyson,

Markessa Carter, and Rachel Eckroth.   Plaintiff testified that for

---

[24]Id. at 12-13 (quoting Turner's Deposition, Exhibit 2 thereto,
Docket Entry No. 36-2, pp. 181:24-182:9, and pp. 183:21-184:9).

a number of years Williams had advised her to falsify REX data.[25]
Tyson testified similarly as follows:

22      And so the directive that we received from

23      Russell [Williams] was if you're spending seven
        hours in one

24      Wal-Mart, while you're in that Wal-Mart, you need to

25      clock in to the rest of your stores that you were

1       supposed to be in that day.  That way that your cycle

2       analytics stay on track and that as a team we don't get

3       dinged for not having the correct model time or that

4       you're deviating from your route.

                        .  .  .

20      Q.   Okay, How would that work?

21      A.   It worked is that you spend seven hours in one

22      Wal-Mart, and while you're in that Wal-Mart, you take

23      your handheld, and you clock in to another store while

24      you're still in that Wal-Mart.  That way you're showing

25      the system I've been to all of these stores today,

1       knowing that you've only been to one.

2       Q.   Okay.  And where did you get the information on

3       how to do that?

4       A.   From Russell [Williams] and from other teammates.

5       Q.   Okay.  And you're certain that that came also

6       from Russell?

_____

[25]Id. at 12 ¶ 3.20(d) (citing Turner's Deposition, Exhibit 2
thereto, Docket Entry No. 36-2, pp. 161:5-162:25).

7    A.   I'm positive it came from Russell, because I

8    distinctly remember a team meeting where we were

9    complaining about -- our market manager meetings.  As a

10   part of our role, we had to meet with market managers

11   and discuss the business, and sometimes that would

12   require two hours time, and the direction was you still

13   have to meet your goals in terms of being in the other

14   stores that you're supposed to be in that day.

15        So Russell told us, the entire Houston team, if

16   you get into a situation like that, make sure that you

17   clock in to whatever store you're supposed to be in so

18   that you're getting credit for that day.[26]

Carter testified

25   Q.   And the direction about evening up the time on

1    the REX by either clocking in or out early on the REX,

2    that was something that Russell Williams had explained

3    to do?

4    A.   Yes.[27]

Eckroth testified

2    Q.   -- would you clock out on the REX early and clock

3    into the next store early so that the time evened out?

---

[26]Response to MSJ, Docket Entry No. 36, pp. 11-12 ¶ 3.20(a)
(quoting Tyson's Deposition, Exhibit 7, Docket Entry No. 36-7,
pp. 10:22-11:4; pp. 11:20-12:18).

[27]Id. at 12 ¶ 3.20(b) (quoting Carter's Deposition, Exhibit 8,
Docket Entry No. 36-8, pp. 11:25-12:4).

4    A.    Absolutely.

5    Q.    All right.   Is there anybody that directed you to

6    do that?

7    A.    Absolutely.

8    Q.    Who?

9    A.    Russell [Williams] has. . . .[28]

As evidence that Williams warned African American members of
his sales staff that they were being targeted for discharge,
plaintiff cites not only her own deposition testimony but also the
deposition testimony of a former account executive with Hershey's,
Revena Christon, and other RSRs discharged by Williams, i.e.,
Tyson, Carter, and Eckroth.   Plaintiff testified that she has had
multiple conversations with Williams about having too many blacks
on his team, and that he needed to get rid of them.[29]   Each of the
other witnesses cited by plaintiff testified that Williams
regularly stated that he had too many blacks on his sales team.[30]
Eckroth also testified that Williams told her he was not going to

_____

[28]Id. at 12 ¶ 3.20(c) (quoting Examination Under Oath of Rachel
Eckroth ("Eckroth's Deposition"), Exhibit 9, Docket Entry No. 36-9,
p. 12:2-9).

[29]Id. at 9 ¶ 3.13(e) (citing Turner's Deposition, Exhibit 2,
Docket Entry No. 36-2, pp. 120:11-121:11; p. 152:18-19).

[30]Id. at 6-9 ¶ 3.13(a)-(d) (quoting Tyson's Deposition,
Exhibit 7, Docket Entry No. 36-7, pp. 5:17-6:19); Carter's
Deposition, Exhibit 8, Docket Entry No. 36-8, pp. 5:20-6:15);
Eckroth's Deposition, Exhibit 9, Docket Entry No. 36-9, pp. 6:1-11,
6:22-7:5, p. 10:13-24); and Christon's Deposition, Exhibit 10,
Docket Entry No. 36-10, pp. 5:13-6:3).

hire any more black people,[31] and Tyson testified that when an
African American woman she had referred to Hershey was not hired
and she asked why, Williams told her he had too many blacks on his
sales team.[32]   It is undisputed that the decision to discharge
plaintiff and other black RSRs was made by Williams,[33] and that the
black RSRs Williams discharged were replaced with white employees.[34]

Finally, citing Parsons' Declaration, plaintiff argues that
contrary to defendant's argument, Parsons, who is not a member of
plaintiff's protected class, was treated more favorably than she
and Tyson for falsifying REX data.  Plaintiff argues that

> Tyson and Turner were fired. _Parsons was not fired_ . . .
> Parsons was instead given an offer.  He could 1) resign
> and get a favorable reference, 2) could be fired[,] or
> 3) could remain at Hersheys but be [on an] action
> plan. . . Parsons decided to resign and get a good
> reference _and therefore was not fired_ . . . Evidence of
> this kind of more favorable treatment of similarly
> situated employees outside of the protected class can be
> "especially relevant" to a showing of pretext. . .
> Hershey's attempt to state that it treats African
> American Black persons the same as White persons with
> Ryan Parsons as the sole example — miserably fails.
> Hershey's reason given for firing Yolanda Turner is
> without question a pretext for discrimination.[35]

[31]Eckroth's Deposition, Exhibit 9, Docket Entry No. 36-9,
p. 6:24-25.

[32]Tyson's Deposition, Exhibit 7, Docket Entry No. 36-7,
p. 6:13-19.

[33]Response to MSJ, Docket Entry No. 36, p. 6 ¶ 3.12 (quoting
Williams' Deposition, Exhibit 3, Docket Entry No. 36-3, p. 28:5-12).

[34]Williams' Deposition, Exhibit 3, Docket Entry No. 36-3,
pp. 31:16-34:9.

[35]Response to MSJ, Docket Entry No. 36, p. 20 ¶ 4.17 (citing
Ryan Parsons' Sworn Declaration, Exhibit 11, Docket Entry No. 36-
11).

-16-

Plaintiff argues that the evidence she has cited in opposition to the defendant's motion for summary judgment raises genuine issues of material fact for trial that the stated reason for her discharge

> — the so-called falsification of the REX — was a set up
> for termination to disguise discriminatory animus or
> otherwise was mere pretext for discrimination.  It was
> part of the plan to rid Hersheys in Houston of so many
> Black sales workers (although other tactics were used on
> other Black RSRs).[36]

Plaintiff argues that this evidence shows that she was

> targeted and fired for being an African American Black
> sales worker, and the reason given for her termination
> was pretextual.  Williams, whatever his motive, knew and
> intended to get rid of Blacks on his sales team.
> Williams' intent is Hersheys['] intent.  Hersheys has
> discriminated against Yolanda Turner due to race and
> color.[37]

Plaintiff argues that

> Williams articulated an intent to discriminate against
> Blacks, and then carried out that intent as against
> multiples of workers.  One of those workers was Yolanda
> Turner.  Williams created the reason by which he could
> thereby terminate her in furtherance of the discrimina-
> tory intent.  Whites such as Ryan Parsons were treated
> more favorably in hiring and in termination than was
> Yolanda Turner.  Ultimately, the evidence above shows a
> clear discriminatory intent on the part of Williams to
> "get rid" of members of the team that had "too many
> Blacks."[38]

Defendant replies that plaintiff's evidence is not sufficient to establish that its legitimate, non-discriminatory reason for

---

[36]Id. at 10 ¶ 3.17.

[37]Id. at 14 ¶ 3.23.

[38]Id. at 23-24 ¶ 4.21.

discharging plaintiff was a pretext for race discrimination. Defendant argues that it is entitled to summary judgment because it has presented testimony that contradicts the evidence cited by the plaintiff; because Williams is African-American and therefore would not have discriminated against the plaintiff due to her race or color; because Parsons is not similarly situated to plaintiff; and because the Parsons' declaration is not admissible.[39]

Defendant's citations to conflicting evidence do not establish defendant's entitlement to summary judgment but, instead, emphasize that fact issues exist for trial. The fact that Williams belongs to the same protected class as the plaintiff does not necessarily mean that he did not discharge plaintiff for discriminatory reasons. See Oncale v. Sundowner Offshore Services, Inc., 118

---

[39]Defendant's Reply Brief in Further Support of Summary Judgment, Docket Entry No. 37, pp. 6-13. Citing S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489 (5th Cir. 1996), and Cleveland v. Policy Management System Corp., 119 S. Ct. 1597 (1999), defendant also argues that

> Plaintiff attempts to have it both ways. On the one hand, she (ostensibly) claims that she did not falsify data. On the other hand, Plaintiff claims that this was a "set up," in that Williams allegedly "told her to enter aspirational time entries in the REX [sic] instead of actual times and used that same instruction as the reason for terminating her employment."

Id. at 7. The two cases that defendant cites each stand for the well settled principle that a party may not defeat a motion for summary judgment by contradicting his or her own previous sworn statement with a new statement without explaining the contradiction. See S.W.S. Erectors, 72 F.3d at 495; Policy Management, 119 S. Ct. at 1603-04. Because plaintiff has not engaged in such an effort, this argument and the cases cited in its support are inapposite.

S. Ct. 998, 1001 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). Defendant's arguments that Parsons is not similarly situated to the plaintiff, and that his declaration is not admissible have no merit because defendant compared Parsons to plaintiff in its motion for summary judgment, and argued that since Parsons, like plaintiff, was discharged by Williams for falsifying REX data, plaintiff is unable to establish that anyone outside of her protected class was afforded more favorable treatment for falsifying REX data.[40]   The Parsons declaration submitted by plaintiff is admissible to contradict the defendant's contention that Parsons was not afforded more favorable treatment than the plaintiff for falsifying REX data.

Plaintiff has cited undisputed evidence that Williams directed not only her, but also other members of his sales team to disregard Hershey's official policy for entering REX data. A jury could draw inferences and reasonably conclude from this evidence that plaintiff did not falsify REX data on November 9, 2011, or that if she did, or if Williams believed she did, Williams nonetheless intentionally exaggerated his concern over such conduct, and that conduct was not the real reason she was discharged. Plaintiff has therefore cited evidence from which a reasonable fact-finder could

---

[40]See Defendant's MSJ, Docket Entry No. 33, pp. 10-11 ¶ 24, p. 17 ¶ 37.

conclude that defendant's stated reason for her discharge was false.

Plaintiff has also presented undisputed evidence that Williams repeatedly stated to members of his sales team and to at least one other (Christon) that he had too many blacks on his team, he needed to get rid of blacks on his team, and he would not hire more blacks. The Fifth Circuit has "held that comments may be circumstantial evidence of discrimination if they reflect discriminatory animus and are uttered by a person who wields influence over the challenged employment action." Autry v. Fort Bend Independent School District, 704 F.3d 344, 348-49 (5th Cir. 2013) (citing Reed v. Neopost USA, Inc., 701 F.3d 434, 441 (5th Cir. 2012)). Here, Williams' comments reflect discriminatory animus of the person who undisputedly made the decision to discharge plaintiff. Plaintiff has presented undisputed evidence that Hershey replaced the black African-American employees that Williams discharged with employees who were not African-American. Plaintiff has also presented evidence that Ryan Parsons, a Caucasian white employee who, like plaintiff, was supervised by Williams and was accused of falsifying REX data, was treated more favorably than the plaintiff was treated. A jury could draw inferences and reasonably conclude from this evidence that defendant's stated reason for plaintiff's discharge is not only false, but is also a pretext for race or color discrimination. The summary judgment evidence is therefore sufficient to raise genuine issues of material fact for trial.

## IV.   Conclusions

For the reasons stated above, the court concludes that plaintiff has presented evidence from which a reasonable fact-finder could conclude that the defendant's stated reason for her discharge is not true but is, instead, a pretext for discrimination based on race or color.   Accordingly, Defendant's Motion for Summary Judgment (Docket Entry No. 33) is **DENIED.**

The court concludes that this case is appropriate for mediation.   If the parties are unable to settle the case within the next thirty (30) days, they will provide the court with the name, address, telephone number, facsimile number, and e-mail address of an agreed upon mediator.

**SIGNED** at Houston, Texas, on this 3rd day of October, 2014.

SIM LAKE
UNITED STATES DISTRICT JUDGE